# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kriss S.,<br><br>                    Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill,<br>Acting Commissioner of Social Security,<br><br>                    Defendant. | Case No. 18-cv-0389 (DWF/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kriss S. seeks review of the denial by the Acting Commissioner of Social Security (the "Commissioner") of her application for supplemental social security income ("SSI") benefits. *See* (Compl. [Doc. No. 1 at 1].) The parties filed cross-motions for summary judgment. (Pl.'s Mot. for Summ. J. [Doc. No. 11]; (Def.'s Mot. for Summ. J. [Doc. No. 13].)  For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment be denied, and that the Commissioner's Motion for Summary Judgment be granted.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff protectively filed for SSI on November 12, 2014. *See, e.g.*, (Admin. R. [Doc. No. 10 at 76, 166].)  Plaintiff asserted an alleged onset date ("AOD") of February 15, 2010, claiming disability as a result of depression and social anxiety disorder. *See,*

*e.g.*, (*id.* at 64, 76). Plaintiff's claim was denied initially and upon reconsideration. (*Id.* at 15, 90–93, 98–100.) Following a hearing, an administrative law judge (the "ALJ") denied benefits to Plaintiff. (*Id.* at 27.) On December 12, 2017, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (*Id.* at 1.) The decision by the Appeals Council to deny review rendered the ALJ's decision final. *See* 20 C.F.R. § 416.1481; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

### B.    The ALJ's Decision

On February 23, 2017, the ALJ issued a decision concluding that Plaintiff was not disabled after conducting a five-step analysis prescribed by 20 C.F.R. § 416.920(a)–(g). (*Id.* at 15–27.)

At step one, the ALJ concluded Plaintiff has not engaged in substantial gainful activity as of her AOD. (*Id.* at 17.) At step two, the ALJ considered the following to be severe impairments under the regulations: "generalized anxiety disorder; social anxiety disorder; and major depressive disorder." (*Id.* at 17–18.) At step three, the ALJ considered Listing 12.04 and Listing 12.06 and determined that none of Plaintiff's impairments meet or are medically equivalent to one of the Listings. *See* (*id.* at 18–20.)

At step four, the ALJ concluded Plaintiff has the RFC to work at all exertional levels, "with the following nonexertional limitations: simple, routine and repetitive tasks but not at a production rate pace such as that found in assembly-line work; and able to respond appropriately to supervisors and coworkers occasionally but not able to respond appropriately to the public." (*Id.* at 20.) The ALJ stated that "[t]he objective medical evidence, observations by providers, medication, and course of medical treatment

2

regarding the claimant's mental impairments are consistent with the above residual

functional capacity assessed, and inconsistent with the degree of isolating social anxiety,

depression and panic attacks . . . alleged by the claimant." (*Id.* at 21.)  With respect to

activities of daily living, the ALJ noted that Plaintiff lives alone and cares for her small

dog and drives to her mother's house daily to help her mother with tasks around her

mother's house.  (*Id.* at 24.)  The ALJ also noted that Plaintiff "is capable of arranging

and scheduling her medical appointments, and she typically attends these appointments

independently.  She also participates and makes decisions regarding her medical

treatment/therapy."  (*Id.*)  The ALJ also discussed occasional social interaction with one

friend in further support of the ALJ's conclusion that Plaintiff's activities of daily living

did not support her claims regarding the limiting effects of her isolating social anxiety,

depression, and panic attacks.  (*Id.*)

        Regarding opinion evidence, the ALJ gave the opinion of the state psychologists

substantial weight because the opinions were

>        consistent with the objective medical records, including the minimal to
>        moderate clinical findings and signs of mental impairments, observations
>        by providers, mental status examinations, course of treatment with chronic
>        refusal to adjust medications or to receive additional mental health
>        treatment and care, no intensive or aggressive mental health
>        treatment/therapy, her function report, and her daily activities.

(*Id.* at 25.)  The ALJ also addressed the opinion of Patricia Mayer, MD, Plaintiff's

treating physician, who opined that Plaintiff exhibited "significant [anxiety] symptoms,

which limited her ability to work outside the home." (*Id.*)  The ALJ gave this opinion

little weight because "the claimant has repeatedly refused additional mental health

treatment and her refusals were not well explained or well founded. Dr. Mayer continued

medication management without significant changes or adjustments, and the claimant's

mental status examinations remained without significant abnormalities . . . ." (*Id.*) The

ALJ also observed that "the claimant's daily activities as noted above are inconsistent

with disabling anxiety symptoms as she presented to Dr. Mayer regularly for

appointments and drove to her mother's house daily to help out." (*Id.*) In addition,

Dr. Mayer no longer followed the Plaintiff after providing this opinion. As a result, the

ALJ considered the opinion to be "a snapshot in time rather than an ongoing, current

depiction of the claimant's overall mental functioning." (*Id.*)

At step five, considering Plaintiff's age, education, work experience and RFC, the

ALJ found that Plaintiff could work in jobs that exist in significant numbers in the

national economy, including: industrial cleaner; dishwasher, kitchen helper; and routing

clerk. (*Id.* at 26–27.) Thus, the ALJ held that Plaintiff was not disabled. (*Id.* at 27.)

Plaintiff asserts errors related to the ALJ's determination at step four. *See*

*generally* (Pl.'s Mem. of Law in Supp of Mot. for Summ. J., "Pl.'s Mem. in Supp." [Doc.

No. 12].) In particular, the Plaintiff argues that substantial evidence does not support the

ALJ's conclusion that she has only moderate limitations in her social functioning, and

that the ALJ improperly discredited the Plaintiff's alleged impairments on the basis of

Plaintiff's failure to follow prescribed treatments. (*Id.* at 9–11.)

### C.    Factual Background[1]

### 1.    Plaintiff's Background and Testimony

Plaintiff has a high school education.  She has not worked consistently since around 1999, and she stopped working altogether around 2011. *See, e.g.*, (Admin. R. at 17, 26, 161, 171, 177.)

At the hearing before the ALJ, Plaintiff testified that she visits with her mother "[e]very day to bring her her mail and paper," that she helps with the cleaning and cooking, and gets along "wonderful[ly]" with her.  (*Id.* at 41.)  Plaintiff also mentioned that she would never consider doing these types of activities for anyone else because she is "comfortable with [her] mother." (*Id.* at 57.)  Plaintiff stated that she typically is in bed fourteen to sixteen hours per day, and that her arrival time at her mother's home is irregular. *See* (*id.* at 55.)  Plaintiff noted that her mother does not seem to care when she arrives because "[s]he knows that I can get there when I can get there." (*Id.* at 55.)

She also testified that she has two siblings nearby but that she does not see them. (*Id.*at 41.)  Plaintiff stated that besides her friend and her mother, there is no one else that she sees on a regular basis.  (*Id.* at 54.)  Plaintiff testified that her friend comes to Plaintiff's house "[m]aybe once a week." (*Id.* at 54.)  Plaintiff also mentioned that she does not leave the house to mow her lawn; her daughter does that for her.  (*Id.*)

Plaintiff further testified that she can drive, but that her friend shops for Plaintiff's groceries. (*Id.* at 41.)  Plaintiff does shop with her mother when her mother goes to the

---

[1]  The Court has reviewed the entire administrative record but summarizes only the evidence necessary to provide context for the issues before the Court.

grocery store, and she is able to retrieve her mother's prescriptions from the pharmacy about five times per month.  (*Id.* at 42.)  Plaintiff testified that she does not shop for clothes, does not leave the house to visit her friend, but will occasionally leave the house during the summer to go to a campground.  (*Id.* at 42–43.)

Plaintiff testified that the last time she went to therapy was 2010, and that it did not help.  (*Id.* at 47.)  Plaintiff stated that she gets panic attacks "[a]ll the time," even at home.  (*Id.* at 57.)  She testified that she currently takes Effexor for her depression,  that she had been on it starting in about 1994, and that her dosage had gone up a few times over the past ten years. (*Id.* at 49.)  With respect to her anxiety, Plaintiff stated that she takes a number of medications for various conditions and was not certain which medicines treated which conditions, but that she believed she took BuSpar and propranolol for her anxiety.  *See* (*id.* at 50–52.)  She takes BuSpar twice a day.  *See* (*id.* at 51.)  She takes propranolol only when she leaves the house because her doctors instructed her to take it only in emergencies and, she testified, she does not need it at home.  *See* (*id.* at 52.)  One of the reasons she gave for her limited usage of propranolol is because "[i]t calms my body down quite a lot, sometimes too much.  That's why I don't take it because it feels like I haven't taken my depression medicine, I'm so low." (*Id.*)  When asked whether she had taken her propranolol the day of the hearing, she said that she had not "because I didn't get out of bed until I was almost picked up [for the hearing]."  (*Id.*)

In response to questions about why she had not followed recommendations from her treating physicians to alter her medications, Plaintiff testified:

The medicine that they were writing down that I refused was changing my antidepressant. I've been on my antidepressant since 1991. I've tried many other ones. The very first time I realized I had depression after my grandma died and needed help, I had a bad counselor and bad medicine and I ended up in the hospital on life support in a coma for seven days partly because of how I was feeling and partly because of medicine. I was telling [my medical provider] for several days that my head was in the clouds and I can't – because I was up to four pills a day, and I said I can't function. I can't work. I can't do anything and she didn't change my medicine. Now I know much, much more about what depression is about and I'm too afraid. [My current dosage] is somewhat working, or I wouldn't be able to sit here or do anything if I didn't take the medicine that I'm on now. So yes, I have not changed to a new medicine because I don't want anything to happen. That's what that means.

(*Id.* at 48.)

Plaintiff stated that she had not discussed modifying her anxiety medication with her current primary care physician "because "[w]e're not worried about it because I don't go out of the house much." (*Id.* at 56.) That said, Plaintiff indicated a willingness to try different medications because, although her current primary care physician was new, Plaintiff was "starting to be comfortable with her and she's telling me that some of the new [drugs] are really good." (*Id.* at 59.)

Plaintiff's counsel asserted at the hearing that the very nature of Plaintiff's condition makes it difficult for her to seek out or otherwise modify her medical care. *See* (*id.* at 37–39.) For example,

Even today, [Plaintiff] really wanted me to see if I could get her close friend to come in with her to provide her with some additional stability, but I advised against that because I think it's important for the Court to get a feel from [Plaintiff] as she would be in any given job. And so I'm not sure if the Court can note this, but she's weeping relatively openly and has been extremely anxious about coming here today.

(*Id.* at 37.)  Plaintiff's counsel also attempted to calm Plaintiff at times during the hearing.  *See, e.g.*, (*id.* at 53 (stating "You're okay. You're okay."))

### 2.    Relevant Medical Evidence

There is little medical evidence specific to Plaintiff's mental health limitations in the record.  The psychological clinic that Plaintiff visited in 2010 did not provide medical records in response to the Commissioner's request for information because the clinic did not have records in the requested date range.  *See* (*id.* at 313.)  Furthermore, although Plaintiff's counsel sought to retrieve and introduce records from her prior treatment at that clinic, those records had been destroyed because it had been more than five years since her last visit and the clinic retained records for five years only. (*Id.* at 37.)  The remaining medical records before the ALJ document Plaintiff's visits with her primary care physicians—Dr. Mayer and Addie C. Licari, MD—primarily for physicals and follow-up visits. *See* (*id*. at 243–312, 317–342.)

### a.    Dr. Mayer

Dr. Mayer saw Plaintiff from about 2011 until September 2014, mostly for periodic follow-ups regarding Plaintiff's hypertension, hyperlipidemia, tobacco abuse, hypothyroidism, gastroesophageal reflux disease, prediabetes concerns, and obesity.  *See* (*id.* at 243–62, 266–71.)  In the course of those visits, Dr. Mayer also addressed Plaintiff's complaints of depression and anxiety.  *See* (*id.*)

In a November 7, 2012, visit for a medication and laboratory results review, Dr. Mayer noted that Plaintiff's "mood has been good" and "[o]verall patient feels well." (*Id.* at 245.)  She noted that her affect and tone were normal.  (*Id.* at 247.)  In a July 31,

2013, visit, Dr. Mayer noted that Plaintiff's "mood has been OK despite all the stressors she feels." (*Id.* at 248–49.) Her Patient Health Questionnaire (PHQ) score indicated only mild depression. (*Id.* at 249.) Her examination showed no significant changes from the previous visit, and she showed normal affect and tone, and good judgment and reasoning. (*Id.* at 251.) She reiterated her impression of unspecified anxiety and depression, although she noted Plaintiff was "doing OK" with her depression, and she refilled Plaintiff's lorazepam prescription for anxiety. (*Id.* at 251–52.)

Plaintiff saw Dr. Mayer on March 26, 2014, for her annual physical. *See* (*id.* at 252–57.) During that visit, Dr. Mayer noted Plaintiff was "basically having a panic attack" while there. (*Id.* at 252.) Plaintiff told her that it started on the car ride over to the appointment. (*Id.*) Once again, the PHQ score indicated only mild depression, but Dr. Mayer's treatment notes reported that Plaintiff "expresses symptoms of significant social anxiety disorder" and that her "mood symptoms . . . [go] back to when her husband died at a young age. She seems to have never recovered." (*Id.* at 252, 253.) Dr. Mayer noted that Plaintiff "looks anxious, upset," but that she tended to relax as they visited. (*Id.* at 255.) Dr. Mayer was able to have a discussion with Plaintiff about her anxiety disorder "at length," but reported that Plaintiff "refuse[d] to make any changes, though to see psychiatry, return for counseling. She says she is fine she just gets stressed coming here." (*Id.* at 252.) Plaintiff stated she was using lorazepam "on a very sparing basis." (*Id.*) Dr. Mayer continued Plaintiff's Effexor and lorazepam, but in light of the observed anxiety attack, she started Plaintiff on propranolol, up to twice a day as needed for social

anxiety disorder, and recommended that Plaintiff resume counseling, which Plaintiff refused. *See* (*id.* at 257.)

During a September 24, 2014, follow-up visit regarding Plaintiff's hypertension, Dr. Mayer stated that Plaintiff's blood pressure "always gets higher when she comes here . . . because of her significant anxiety." (*Id.* at 258.) Dr. Mayer noted that "[a]nxiety continues to be problematic. Hard time leaving the house. Hard time focusing and doing day to day things." (*Id.*) In addition, Plaintiff's PHQ score was higher and reflected moderate depression. Discussing Plaintiff's past mental health therapeutic history, Dr. Mayer's treatment notes reported "failed outpatient therapy," and that Plaintiff "[h]as been on different medications in the past and [f]ailed desimpramine [sic], Prozac, Welbutrin [sic], Zoloft, Paxil," but that "Effexor has worked the best. Has not been on BuSpar." (*Id.*) Plaintiff also mentioned to Dr. Mayer on that visit that she had considered applying for SSI benefits. In that regard, Dr. Mayer opined in her treatment notes that Plaintiff "[c]ertainly has significant symptoms which limits [her] ability to work outside the home." (*Id.* at 261.) Dr. Mayer's impression was generalized anxiety disorder, social anxiety disorder, and major depression. She continued Plaintiff on propranolol and Effexor. Noting Plaintiff's reluctance to try therapy, Dr. Mayer reported that Plaintiff "[h]as failed counseling and it even makes her anxious to go," and that she "has been through so much therapy in the past but she doesn't think it would be helpful." (*Id.*) She did note, however, that Plaintiff had "agree[d] to try the addition of BuSpar," so she started Plaintiff on a low dose. (*Id.*)

b.    **Dr. Licari**

Plaintiff transitioned to Dr. Licari as her primary care physician in November of 2014.  *See* (*id.* at 262–266.)  During Dr. Licari's initial assessment, she noted that Plaintiff reported improvement in her anxiety from taking Effexor and BuSpar, but was nevertheless reluctant to increase her BuSpar dosage as recommended by Dr. Licari.  *See* (*id.* at 336.)  Dr. Licari's clinical notes stated that Plaintiff's anxiety disorder was "[n]ot well-controlled seemingly but patient does not want to adjust or change medication at this time.  She is likely on a subtherapeutic dose of BuSpar."  (*Id.* at 339.)  Dr. Licari did not recommend counseling or a psychiatric evaluation.  At her next follow-up visit, in March 2015, Dr. Licari again opined that Plaintiff suffered from a generalized anxiety disorder that was not well controlled, but although various combinations of medications were discussed, Plaintiff was not willing to make any changes, and declined a psychiatric medication review.  (*Id.* at 331, 334.)  At that same visit, when Plaintiff and Dr. Licari discussed Plaintiff's acid reflux, Dr. Licari noted that Plaintiff did not feel like her acid reflux medication was working and "wonder[ed] whether we can try something different for her acid reflux." (*Id.* at 331.)  As a result, Dr. Licari prescribed Nexium, and if that "is not effective or covered [by insurance] will find other options for the patient." (*Id.* at 334.)

Plaintiff saw Dr. Licari for a complete physical on December 30, 2015.  *See* (*id.* at 322–30.)  Her PHQ score was in the range of moderate depression.  (*Id.* at 322.) She told Dr. Licari that she did not like to have contact with anyone other than family and tried not to leave the house.  (*Id.*)  Dr. Licari again noted Plaintiff was not in therapy.  (*Id.*)  She

presented as depressed and anxious, but not in acute distress, and Dr. Licari saw no issues with memory, concentration, or attention. (*Id.* at 326.) Dr. Licari also expressed the concern that Plaintiff's continued self-isolation made her anxiety worse on the rare occasions when she did go out in public. (*Id.* at 328.) Dr. Licari continued the current medications and increased Plaintiff's BuSpar slightly, but reported that Plaintiff was still not open to therapy of any kind, and was not motivated to make any significant changes in her lifestyle. *See* (*id.* at 327–28.)

The last appointment of record with Dr. Licari was on June 30, 2016. *See* (*id.* at 316–21.) At that appointment Plaintiff reported some trouble with side effects from the Effexor, but decided to wait about trying Dr. Licari's recommendation of splitting the doses. (*Id.* at 316.) Dr. Licari observed that she was mildly depressed and anxious, but otherwise not in distress. (*Id.* at 320.) Dr. Licari kept her on the same medication, and again noted that Plaintiff was not willing to make any changes or undergo different or additional mental health treatment because of bad experiences in the past, including side effects and unsatisfactory interaction with her providers. (*Id.* at 316, 320–21.)

None of the records from Dr. Licari contain an opinion about the effect of Plaintiff's conditions on her ability to work.

Neither Dr. Mayer nor Dr. Licari opined as to whether, as Plaintiff's counsel argued at the hearing, Plaintiff's resistance to making changes to her course of medical treatment is a medically determinable symptom of her anxiety.

12

### c.    State Agency Consultants

State agency consultants Ken Lovko, PhD, and R. Owen Nelson, PhD, LP, reviewed the record and opined as to Plaintiff's medically determinable impairments and as to disability. *See, e.g.*, (*id.* at 68, 72, 74, 81, 84, 86.) Drs. Lovko and Nelson each opined that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms. *See, e.g.*, (*id.* at 69, 81.) Nevertheless, both doctors stated that the intensity and limiting effects of the symptoms was "not substantiated by the objective medical evidence." *See, e.g.*, (*id.* at 69, 81–82.) In support of these positions, both doctors stated "[t]here is no indication that there is medical or other opinion evidence" that supports Plaintiff's allegations. *See* (*id.* at 69, 82.) In addition, the doctors stated that Plaintiff was only partially credible in light of the Plaintiff's medical history and evidence in the medical record. *See, e.g.*, (*id.* at 71, 84.) For example, each stated that Plaintiff has "credible [medically determinable impairments], yet also has repeatedly refused to accept referrals to mental health specialists." (*Id.*) Furthermore, the doctors opined that

> The evidence suggests that claimant can understand, remember, and carry-out unskilled tasks without special considerations in may work environments. The claimant can relate on at least a superficial and ongoing basis with co-workers and supervisors. The claimant can attend to task[s] for sufficient periods of time to complete tasks. The claimant can manage stresses involved with unskilled work.

(*Id.*) As a result, Drs. Lovko and Nelson stated that Plaintiff "endorses a severity of impairment that is not corroborated by the totality of evidence." *See, e.g.*, (*id.* at 69, 81.)

13

For these reasons, Drs. Lovko and Nelson opined that Plaintiff is not disabled. *See* (*id.* at 73, 86.)

## II.    DISCUSSION

Plaintiff argues that the ALJ's findings of fact at step four regarding her mental health impairments are not supported by substantial evidence and that the ALJ erred in the manner in which he "evaluat[ed] Plaintiff's alleged failure to follow prescribed treatment." *See* (Pl.'s Mem. in Supp. at 9–11.)  The Court addresses only these arguments. *See Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (stating the claimant waived issues not raised before the district court).

### A.    Legal Standard

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g).  The Court's review of the Commissioner's final decision is deferential; the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  The Court's task is not to reweigh the evidence. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).  Instead, the Court must "review the record for legal error and   . . . ensure that the factual findings are supported by substantial evidence."  *Hensley*, 352 F.3d at 355.

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence, but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th

14

Cir. 2003). This Court must "consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it." *Sales v. Apfel*, 188 F.3d 982, 984 (8th Cir. 1999) (alteration in original) (internal quotation marks omitted).

"The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). In this context, Plaintiff must provide "*medical evidence* that addresses the claimant's ability to function in the workplace" so that an ALJ may compare it with "all the evidence in the record" to determine an RFC. *Id.* at 807 (emphasis added). The ALJ is only required to include limitations in an RFC that are supported by substantial evidence in the record as whole. *Cf. Lacroix v. Barnhart*, 465 F.3d 881, 888 (8th Cir. 2006).

### B.    Analysis

As an initial matter, the Court first addresses the Commissioner's position that the relevant time period began on the date Plaintiff filed her SSI application. *See* (Def.'s Mem. in Supp. of Mot. for Summ. J. [Doc. No. 14 at 2 n.1].) In parts of the ALJ's decision, he identified the AOD as the starting point of the relevant period. *See, e.g.*, (Admin. R. at 21–22.) But the bulk of the ALJ's determination was premised on a conclusion that the relevant period began on November 12, 2014, the date Plaintiff filed her SSI application. *See, e.g.*, (*id.* at 17, 26, 27.) This is the correct approach. *See Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989). As a result, the Court analyzes the medical record keeping this timeframe in mind. *See Cruse*, 867 F.2d at 1185. That said, "additional medical evidence dated outside the relevant time period can be material if it is close enough in proximity to the relevant time period that it can be said to relate back."

15

*Mills v. Colvin*, No. 12-2291, 2013 WL 6797568 at *3 (W.D. Ark. Dec. 23, 2013)

(Marschewski, C. Mag. J., as adopted by Dawson, J.) (citing *Basinger v. Heckler*,

725 F.2d 1168, 1169 (8th Cir. 1984)).

    Here, the only medical evidence after November 12, 2014, is Dr. Licari's

treatment notes from visits on March 24, 2015, December 30, 2015, and June 30, 2016.

*See* (Admin. R. at 322–35.)  Consistent with the ALJ's decision, Dr. Licari's treatment

notes are insufficient to establish that Plaintiff is disabled.  During the March 2015 visit,

Dr. Licari noted that Plaintiff was "[a]lert and oriented x3.  Normal mood and affect,"

and that Plaintiff "was not in any distress."  (*Id.* at 333.)  Furthermore, as described

above, Dr. Licari noted that Plaintiff did not feel like her acid reflux medication was

working and "wonder[ed] whether we can try something different for her acid reflux,"

and Dr. Licari prescribed Nexium.  (*Id.* at 331, 334.)   During the December 2015 visit,

Dr. Licari opined that Plaintiff was moderately depressed, and "anxious at times," but

was otherwise "not in distress." (*Id.* at 322, 326.)  Dr. Licari also stated that she would

like to increase Plaintiff's anxiety medications slightly and that Plaintiff "was open to

doing this." (*Id.* at 327–28.)  During the June 2016 visit, Dr. Licari noted that Plaintiff

was "[a]lert and oriented x3," with "[n]ormal mood and affect." (*Id.* at 320.)  Dr. Licari

also stated that Plaintiff was "not in any distress," but was "[m]idly depressed" and

"[m]idly anxious." (*Id.*)  At no point does Dr. Licari opine as to whether Plaintiff's

impairments restrict her ability to work.

    That said, evidence may be material if it is close enough in proximity to the

relevant time period to relate back.  *See Mills*, 2013 WL 6797568 at *3.  Typically, there

is a presumption that records within a few months of the relevant period are material. *Id.*
Without explanation, the ALJ considered evidence dating back to 2012, almost two years
before the relevant period. *See, e.g.*, (Admin. R. at 22.) Presumably this is because the
record evidence in the relevant period is so scant that the ALJ needed to consider
additional information to provide him with additional context to render a decision. But
these prior medical records, which include the treatment notes of Dr. Mayer, are also not
sufficient, alone or in combination with the treatment notes of Dr. Licari, to support a
finding that Plaintiff is disabled.

Much of the medical record regarding Plaintiff's anxiety—both before and during
the relevant period—are notes by her treating physicians that memorialize Plaintiff's
subjective complaints. *See generally* (*id.* at 243–312, 317–342.) Importantly,
Dr. Mayer's opinion with respect to Plaintiff's mental impairments and her ability to
work is couched in language that suggests Dr. Mayer is merely recording Plaintiff's
subjective complaints. For example, Dr. Mayer stated that Plaintiff "expresses symptoms
of significant social anxiety disorder," and that these "significant symptoms . . . limit[]
[her] ability to work outside the home." *See* (*id.* at 252, 261.) Typically, a physician's
reliance on subjective complaints is a proper basis to discount or discredit those opinions.
*See, e.g.*, *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012). Thus, the Court is not
faced with a situation in which the ALJ failed to consider or improperly discredited
objective medical evidence that shows or otherwise suggests that Plaintiff is as impaired
as she alleges. Instead, what the Court must consider is whether the ALJ properly
discredited Plaintiff's subjective complaints in the absence of objective findings that

support Plaintiff's disability claim. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). After careful review of the record, the Court concludes that the ALJ's challenged determinations are supported by substantial evidence in the record as a whole.

Plaintiff asserts that the ALJ erred in the manner in which he "evaluat[ed] Plaintiff's alleged failure to follow prescribed treatment." *See* (Pl.'s Mem. in Supp. at 11.) Under Eighth Circuit caselaw, whether a claimant's noncompliance can be excused on the basis of alleged mental impairments is a critical question that must be addressed by the ALJ. *See Pate-Fires v. Astrue*, 564 F.3d 935, 945–46 (8th Cir. 2009). The reasoning in *Pate-Fires* is instructive here. For example,

> Throughout its decision, the ALJ referenced instances in the record in which Pate–Fires had indicated her understanding of the need to comply with her medication requirements to support his conclusion she did not have a good reason for her medical noncompliance. But the ALJ failed to make the *critical distinction* between Pate–Fires's awareness of the need to take her medication and the question whether her noncompliance with her medication was a medically-determinable symptom of her mental illness.

*Id.* at 945 (emphasis added). In other words, the court in *Pate-Fires* concluded that while there was substantial evidence to support the ALJ's decision that Pate-Fires was not following a recommended course of treatment, "this evidence does not resolve the relevant question here: whether her failure or even refusal to follow the prescribed treatment was a manifestation of her schizoaffective or bipolar disorder." *Id.* at 946. But in *Pate-Fires*, there was objective medical evidence of the claimant's mental impairments and their effect on her ability to work as well as on her ability to comply consistently with prescribed medications. *Id.* at 943–47. As a result, the Eighth Circuit determined that "the record overwhelmingly support[ed] a finding of disability" and "reverse[d] the

18

judgment of the district court and remand[ed] this matter with instructions to remand the

case to the Social Security Commissioner for an award of benefits." *See id.* at 947.

Here, by contrast, the suggestion that Plaintiff's failure to follow her doctors'

recommendations as to medication, therapy, and lifestyle changes was a medically

determinable symptom of her mental illness is found only in counsel's argument, not in

the medical records. *See* (Admin. R. at 37–39.)  Moreover, as described above, the

record in this case is devoid of any appreciable objective evidence or even medical

opinion supporting Plaintiff's position that she is altogether unable to work; thus, the

Court is largely left with evaluating the ALJ's decision in light of Plaintiff's subjective

complaints. *See Polaski*, 739 F.2d at 1322.

While it is true that an ALJ has an affirmative duty to fully develop the record, this

obligation is not implicated in this instance. *See, e.g.*, *Stormo v. Barnhart*, 377 F.3d 801,

806 (8th Cir. 2004); *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also Hepp*,

511 F.3d at 806 (declining to remand for alleged error when error "had no bearing on the

outcome").  If, for example, as in *Pate-Fires,* "the record overwhelmingly support[ed] a

finding of disability" and the ALJ had premised his adverse disability determination

solely on Plaintiff's failure to comply with her physicians' recommendations regarding

medication and therapy, the Court would strongly consider recommending remand to

fully develop the record on this issue. *See, e.g.*, *Collins v. Astrue*, 648 F.3d 869, 872 (8th

Cir. 2011) (holding that implicit consideration of information was not merely a

deficiency of opinion-writing when the reviewing court cannot determine "on what basis

the Commissioner denied a social security disability claim"); *see also Pate-Fires*,

564 F.3d at 946–47.  Here, however, the ALJ also considered Plaintiff's activities of daily living, statements made by her treating physicians, and her own inconsistent statements to conclude that Plaintiff was not as impaired as she alleged.  *See, e.g.*, (Admin. R. at 21–25.)  The Court concludes that the ALJ's determinations in these regards are supported by substantial evidence in the record as a whole.

Moreover, the record evidence is inconsistent with Plaintiff's argument that her failure to make changes in her medical care is a medically determinable symptom of her anxiety.  For example, during a visit with Dr. Licari, Plaintiff mentioned that her acid reflux medication was not working and asked Dr. Licari whether a different medicine would be more effective.  (Admin. R. at 331.)  Dr. Licari noted that Plaintiff "wonder[ed] whether we can try something different for her acid reflux."  (*Id.*)  Plaintiff's willingness to experiment with medication for her acid reflux is inconsistent with her statement that her anxiety prevented such conduct. Likewise, Plaintiff agreed to make changes to her anxiety medication protocol with Dr. Mayer when Plaintiff was prescribed BuSpar.  *See* (*id.* at 261.)  Furthermore, Plaintiff successfully navigated the transition from Dr. Mayer to Dr. Licari as her primary care provider.  There are other inconsistencies in the record too.  For example, Plaintiff testified that she gets panic attacks all the time, even while at home.  *See* (*id.* at 57.)  Yet, there is only one recorded "panic attack" in the medical record—either before or during the relevant period.  Specifically, Dr. Mayer reported that Plaintiff "says she is basically having a panic attack," but Plaintiff "was able to relax as

she conversed with Dr. Mayer and she remained oriented."[2]  *See* (*id.* at 24, 252–53.)

Thus, the inconsistencies in the record work to undermine Plaintiff's credibility as to her

subjective complaints generally, and specifically that her failure to follow medical

recommendations is caused by her anxiety.  *See, e.g.*, *Strongson v. Barnhart*  361 F.3d

1066, 1072 (8th Cir. 2004) (stating "[t]he ALJ may disbelieve subjective complaints if

there are inconsistencies in the evidence as a whole" (internal quotation marks omitted)).

That is, "[i]f an ALJ explicitly discredits the claimant's testimony and gives good reason

for doing so, [courts] normally defer to the ALJ's credibility determination."  *Halverson*

*v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (internal quotation marks omitted).

As to Plaintiff's argument that the ALJ's determination violates Social Security

Ruling 82-59, *see* (Pl.'s Mem. in Supp. at 11), the Court disagrees.  In *Holley v.*

*Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001), the Eighth Circuit considered and

rejected a similar argument:

> Social Security Ruling 82–59 does not apply to this case. Social
> Security Ruling 82–59 only applies to claimants who would otherwise be
> disabled within the meaning of the Act; it does not restrict the use of
> evidence of noncompliance for the disability hearing. Here, the ALJ
> analyzed the evidence of [Plaintiff's] noncompliance within the context of
> his analysis of [Plaintiff's] credibility. The ALJ never determined that
> [Plaintiff] was disabled and that compliance would restore [Plaintiff's]
> ability to work. By contrast, the ALJ determined that in spite of [Plaintiff's]
> noncompliance, [Plaintiff] was not disabled. The ALJ used the evidence of
> [Plaintiff's] noncompliance solely to weigh the credibility of [Plaintiff's]
> subjective claims of pain. Social Security Ruling 82–59 does not restrict the
> use of evidence of noncompliance, it merely delineates the reasons that the
> Social Security Administration may deny benefits to an otherwise disabled

---

[2]  The Court also notes Plaintiff testified that she takes propranolol for her anxiety only
when she leaves the house because her doctors instructed her to take it only in
emergencies and she does not need it at home.  *See* (*id.* at 52.)

person because they fail to comply with their doctor's prescribed treatment. Therefore, Social Security Ruling 82–59 does not apply to this case.

In this case, as in *Holley,* the ALJ did not determine that Plaintiff was disabled and that complying with her doctors' recommendations would restore her ability to work. Rather, he determined she was not disabled, but considered her lack of compliance in evaluating the credibility of her subjective complaints. That analysis does not run afoul of Social Security Ruling 82-59.

Plaintiff's argument that the ALJ erred in the manner in which he determined Plaintiff had only moderate limitations in social functioning, *see* (Pl.'s Mem. in Supp. at 9–11), is also unavailing. Namely, Plaintiff relies primarily on her own subjective complaints to substantiate her position, and essentially invites the Court to reweigh the evidence, which the Court declines to do. *Cf. Gonzales*, 465 F.3d at 894. As discussed above, the ALJ permissibly discounted Plaintiff's credibility and there is substantial evidence in the record to support the ALJ's determination that Plaintiff exhibited only moderate limitations in social functioning. For example, treatment notes from both Dr. Mayer and Dr. Licari found Plaintiff, at most, to be mildly anxious or depressed, generally not in any distress, and alert and appropriately oriented. *See, e.g.*, (Admin. R. at 247, 251, 256, 264, 268, 270, 320, 326, 333.)

In sum, the Court recommends that Plaintiff's motion be denied and that the Commissioner's motion be granted.

## III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.  Plaintiff Kriss S.'s Motion for Summary Judgment [Doc. No. 11] be

    **DENIED**; and

2.  The Acting Commissioner of Social Security's Motion for Summary

    Judgment [Doc. No. 13] be **GRANTED**.


Dated: January 16, 2019                _s/ Hildy Bowbeer_____
                                       HILDY BOWBEER
                                       United States Magistrate Judge


### Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).